Matter of National Council of Young Israel (2003 NY Slip Op 51716(U))

Decided on September 10, 2003

Supreme Court, New York County,
[*1]

Matter of National Council of Young Israel

2003 NY Slip Op 51716(U)

Decided on September 10, 2003

Supreme Court, New York County,

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

 Digest-Index Classification Religious Corporations and Associations—Divestment of Property In the Matter of the Application of NATIONAL COUNCIL OF YOUNG ISRAEL for an ORDER pursuant to Religious Corporation Law § 12 and Not-for-Profit Law § 511 Approving the Sale by NATIONAL COUNCIL of YOUNG ISRAEL of Real Property Located at 3 West 16th Street, New York, New York.
Index No. 206610/2003

Thomas C. Lambert
Lambert & Shackman, PLLC
274 Madison Avenue, New York, NY 10016-0701 212-370-4040
Defendant's Counsel
Michele L. Pahmer
Stroock & Stroock & Lavan, LLP
180 Maiden Lane, New York, NY 10038-4982 Fax: 212-806-7646
Defendant's Counsel
Martin H. Samson, Esq.
Phillips Nizer, LLP
666 Fifth Avenue, New York, NY 10103-0084 Fax: 212-262-5152
Plaintiff's Counsel

Debra A. James, J.
The National Council of Young Israel ("National Council") petitions this court pursuant to Religious Corporations Law § 12 and Not-for-Profit Corporation Law §§ 510 and 511 for approval of the sale of its property at 3 West 16th Street (the "Property") to 3 West 16th Street Associates, LLC (the "Purchaser") pursuant to an Agreement of Sale dated October 30, 2002 (the "Agreement of Sale"). Young Israel of Fifth Avenue ("YIFA") challenges judicial approval of the sale.
3 West 16th Street is a parcel of real estate, which is located in the Flatiron District of Manhattan. The Property is a six-story building, which has an elevator and an internal central staircase, with floors three through six shaped in a "U"-type configuration. National Council, the petitioner in this proceeding, purchased the Property in 1944 from the Ladies Garment Workers Center, Inc. Its national headquarters are housed in the Property. YIFA, an Orthodox synagogue, also resides in the Property. Since 1944, its sanctuary has occupied the Property's ground floor, its kitchen and community room, the second floor, its rabbi's study and library, and the third floor.[FN1]
[*2]
The National Council and YIFA agree that Not-for-Profit Law §§ 510 and 511 apply to the National Council's sale of the Property. YIFA, somewhat contradictorily contends that the National Council is not a religious corporation but a type B corporation, which would mean that the Religious Corporation Law is inapplicable to the sale.
The court disagrees with YIFA on this point. These laws are not mutually exclusive. Both the Not-for-Profit Corporation Law and the Religious Corporation Law apply to the sale at issue because the National Council is both a religious corporation and a type B corporation.[FN2]
The National Council's enabling legislation, corporate purposes and activities, position on this lawsuit (Kroth v Congregation Chebra Ukadisha Bnai Israel Mikalwarie, 105 Misc2d 904, 908-909 [Sup Ct, NY County 1980]), and even YIFA's recital in its papers of the history of the National Council support this dual legal status.
By a Special Act enacted on April 30, 1926 (the "Act"), the New York Legislature created the Council of Young Israel and Young Israel Organizations. On February 15, 1945, the Council of Young Israel and Young Israel Synagogue Organizations changed its name to National Council of Young Israel.
Section 2 of the Act provides that the objects of the National Council are:

a. To promote co-operation among Young Israel and Young Israel Synagogue organizations now existing and which may hereafter be formed, and to establish a closer relationship between them that their individual and common problems may more easily be solved and in order that the influence of these organizations as a factor in Jewry may be increased.
b. To awaken a love for orthodox Judaism and Jewish people within the hearts of American Jewish youth; to foster within them a respect for the glorious past of the Jewish people and its traditions.
c. To do any and all things that may be necessary or incidental to the attainment of this object.
According to YIFA's papers, which are uncontradicted on this point, the Young Israel movement began in about 1912 and has as its objectives the promotion of "Torah true" Judaism and the demonstration of the compatibility of Orthodox Judaism with good American citizenship. The movement constituted an attempt to address some of the difficulties facing American Orthodox Jewry at the time, such as mandatory Shabbos (Saturday) labor at the workplace, the [*3]assimilation of youth into secular American culture, and the lack of availability of Torah education. To address these challenges, the movement established lectures and forums as well as an employment agency for Shabbos observers.
Recognizing the need for a synagogue for youth, many of whom felt as outcasts at services that were dominated by older European immigrants, the movement established a "model synagogue" prayer group, which moved from place to place and had no permanent home.
These two functions, the "forum," that conducted lectures, and the synagogues, where public worship took place, are reflected in the Special Act of 1926 that incorporated the Council of Young Israel and Young Israel Synagogue Organizations. The Council was comprised of synagogues throughout the country that incorporated the phrase "Young Israel" in their names and joined the Council to centralize activities and plan a nationwide dissemination of the movement's ideals.
Religious Corporation Law § 2-a states that the Religious Corporation Law is applicable to "to every corporation formed under any other statute or special act of the state which would, if it were to be formed under the laws of this state, be formed under this chapter." The foregoing history and function of the National Council establishes that it is a religious corporation under the Religious Corporation Law and that law applies to its activities.
Religious Corporation Law § 12 (1) states that:

A religious corporation shall not sell . . . its real property without applying for and obtaining leave of the court pursuant to section five hundred eleven of the not-for-profit corporation law as that section is modified by paragraph (d-1) of subsection one of chapter two-b of this chapter.
With respect to the interplay between that provision and those applicable Not-for-Profit Corporation Law provisions, Religious Corporation Law § 2-b (d-1) excludes eight church denominations [FN3] from the provisions of Not-for-Profit Corporation Law § 510 and § 511. [FN4] Thus, read with Religious Corporation Law § 12, Section 2-b (d-1) makes Not-for-Profit Corporation Law §§ 510 and 511 applicable to the sale of real property by every other religious corporation, which includes petitioner here. [FN5]
[*4]
Not-for-Profit Corporation Law § 511 (b) provides that notice of a petition for leave of court "to sell . . . all or substantially all of its assets" be given to the Attorney General. That provision also states that any person interested whether or not formally notified, may appear at the hearing and show cause why the application should not be granted.
The Attorney General reviewed the Petition and supporting papers prior to the filing of this proceeding. On April 14, 2003, the Attorney General's office appeared, acknowledged receipt of the statutory notice and stated that it had no objection to the granting of judicial approval for National Council's sale of the Property to the Purchaser under the Agreement of Sale.
YIFA appeared on the May 16, 2003, hearing date and submitted its opposition to judicial approval. The impetus for its opposition is a Rider to the Agreement of Sale, which provides that:

the premises are also sold subject to the following:
(c) Rights of Young Israel of Fifth Avenue under a month to month letting of portions of the premises, provided such rights shall be "as tenants only".
National Council's position under the Agreement of Sale, is therefore, that YIFA's only interest in the Property is a month to month tenancy, which may be terminated upon thirty days notice under Real Property Law § 232-a. It is clear that under the Agreement of Sale, the National Council and the Purchaser intend that upon delivery of the Property to the Purchaser, YIFA vacate or be subject to summary removal from the Property. YIFA contends that such removal will result in its demise, since Orthodox tradition requires that YIFA members walk to synagogue for Sabbath and holiday services; a significant number of its members are elderly or infirm and need a facility in the immediate area of its current location; and suitable alternative spaces are beyond YIFA's means given real estate costs in the neighborhood.
The National Council and YIFA disagree that the Petition meets certain mandates under Not-for-Profit Corporation Law § 511, which, in summary, are that the sale be authorized or recommended by the vote of the Board of Directors, that, if required by law, the sale have member consent, that the sale be for fair and reasonable consideration and promote the National Council's corporate purpose and its members interest.
Not-for-Profit Corporation Law § 511 (a) (7) states that the petition must set forth:

That such sale . . . has been recommended or authorized by vote of the directors in accordance with law, at a meeting duly called and held, as shown in a schedule [*5]annexed to the petition setting forth a copy of the resolution granting such authority with a statement of the vote thereon.
Not-for-Profit Corporation Law § 511 (a) (8) states:

Where the consent of members of the corporation is required by law, that such consent has been given, as shown in a schedule annexed to the petition setting forth a copy of such consent, if in writing, or a resolution giving such consent, adopted at a meeting of members duly called and held, with a statement of the vote thereon.
Finally, Not-for Profit Corporation Law § 511 (d) provides:

If it shall appear, to the satisfaction of the court, that the consideration and the terms of the transaction are fair and reasonable to the corporation and that the purposes of the corporation or the interests of the members will be promoted, it may authorize the sale . . . of all or substantially all the assets of the corporation, as described in the petition, for such consideration and upon such terms as the court may prescribe. The order of the court shall direct the disposition of the consideration to be received thereunder by the corporation.
The first questions are whether the petition shows that the Board of Directors of the National Council voted to authorize the sale in accordance with law and whether member consent, if required by law, was given.
The National Council annexes to the Petition as Exhibit K a schedule of the names and residences of its Directors and Officers. The total number of directors and officers listed is twenty-four. Annexed to the Petition as Exhibit G is a three page document, which are the minutes of the November 14, 2002, meeting of the National Council of Young Israel Board of Directors. As for the Sale of the Property, referring to an attachment, the minutes state that the proposed adoption of a resolution pertaining to the sale of the Property carried: "13 Yes, 1 No, 1 Abstained." The attachment, which is the third page of Exhibit G reads, in relevant part:

It is hereby resolved by the Delegates Assembly of the National Counsel (sic) of Young Israel ("National Council") that:
1. The sale ("Sale") of 3 West 16th Street, New York, New York to 3 West 16th Street Associates LLC ("3 West") for $5.4 million is hereby approved in accordance with the terms and conditions of a contract dated October 30, 2002 between the National Council and 3 West.
Annexed to the Petition as Exhibit J is a two page document, which are the minutes of the November 14, 2002 Delegates Assembly meeting. As for the sale of the Property, the minutes, referring to the attachment that is identical to the third page of Exhibit G, states that a resolution pertaining to the sale of the Property carried "47 for, 5 against, 2 abstentions."
The National Council contends that the transaction was duly approved by the Board of Directors pursuant to Sections 6.2 and 12.3 of its Constitution. Its position is that its Board consists of twenty-four members, and that Constitution § 12.3 requires at least ten board [*6]members be present, representing at least five branches, for a quorum. According to the Petition, the fifteen members present at the Directors meeting, representing thirteen member synagogues, met the quorum requirements and the affirmative votes of thirteen of the fifteen members present (with one vote in opposition and one abstention) demonstrate that the sale has been authorized by vote of the directors in accordance with law.
The Petition also alleges that the members approved the sale. According to the National Council, at the meeting of the Delegate Assembly held on November 14, 2002, fifty of the fifty-four delegates present voted in favor of the sale and passed the resolution. Three delegates opposed the sale and one abstained. The Petition cites § 12.1 of the Constitution that provides that a quorum for a meeting of the Delegate Assembly requires at least twenty-five delegates eligible to vote, at least fifteen of whom represent seven or more branches. The National Council contends that the fifty-four delegates representing at least thirty-five member synagogues constituted a quorum.
YIFA counters that the National Council has not demonstrated that the members have consented to the sale and argues that two procedural improprieties, lack of meeting notice to the members and unauthorized teleconferencing participation, invalidated the vote.
Although both parties contend that the sale needed consent of the Delegate Assembly, this court can find no provision in either the National Council's Constitution or the Not-for-Profit Corporation Law that requires such consent. In Kroth v Congregation Chebra Ukadisha Bnai Israel Mikalwarie (105 Misc2d 904, 913 [Sup Ct, NY County 1980]), Judge Martin Evans held that "in the absence of by-laws", the divestiture of real property belonging to a Jewish religious corporation must be approved at a congregational meeting by a majority vote of the members in good standing. Here, unlike the synagogue in Kroth, the National Council has a Constitution, a review of which shows no provision for member voting on a sale of the National Council's real property.
The Constitution, the National Council's by-laws, must comport with the certificate of incorporation. In this case, its enabling legislation constitutes the National Council's certificate of incorporation.
In pertinent part, Section 3 of the Act, provides:

The said corporation * * * shall also have the power in law and equity to take, purchase, lease, hold and receive to it and its successors for and to the use of said corporation, either absolutely or in trust for any of its purposes of for any purposes deemed by the corporation to be in furtherance of its objects, any land, tenements, hereditaments whether situate in the United States or elsewhere, ...whether by grant, gift, purchase, lease, will, devise or bequest from any person or persons whatsoever, and the same to hold, grant, bargain, sell, mortgage, lease, improve or dispose of for the use of the corporation.
Section 4 of the Act states that the National Council has:

[P]ower to grant memberships in its organization . . .in accordance with the constitution and by-laws of the Council of Young Israel and Young Israel Synagogue organizations, which said constitution and by-laws, and as the same shall be adopted and amended from time to time, shall be binding upon every member...; and the said corporation shall have the right to hold its meetings either in this state or at any place [*7]or places in the United States, which from time to time may be appointed for that purpose.
The Constitution currently in effect was ratified by the members on October 6, 1997. Article 3, § 3.1 of the Constitution states that "Membership in the Organization is conferred herewith upon all duly accredited branches groups at the time of the adoption hereof." Section 3.2 states that "Any synagogue group now duly accredited or hereafter granted membership status in the Organization shall be known as a "branch" of the National Council of Young Israel."
Each member of the National Council is a synagogue group whose name includes the descriptive phrase "Young Israel." There are over 140 synagogues located across the United States and Canada, which are National Council members.
By Article 10, § 18 of the Constitution, effective as of 1952 and 1954, the National Council established as one of its standing committees, the Synagogue Committee. One of its duties was "to supervise the services of the Central Synagogue in the organization headquarters." The Central Synagogue or "model synagogue", resided in the Property when it was originally purchased and is YIFA's predecessor. The Central or "model synagogue" grew and began to function more independently over time. It developed its own core of congregants from the neighborhood surrounding the Property. In 1962, it hired its own rabbi. Around the same time, the Central or "model synagogue"
changed its name to "Young Israel of Fifth Avenue." As of October 6, 1997, the National Council Constitution no longer provided for the Synagogue Committee.
Under the current Constitution, YIFA is a branch of the National Council, within the same class of members as the other synagogue members and has no greater or lesser rights than the other members.
The Constitution provides for the representation of members by delegates, which is authorized by Not-for-Profit Corporation Law § 603 (d). Under Section 5.1 of the Constitution, the National Council's delegates comprise the Delegates Assembly, which is the legislative body of the National Council. [FN6] Its duties, powers and rights are set forth in Constitution § 5.2, which are to approve and adopt the annual budget; to hear reports of the Board of Directors as to further fund appropriations; upon recommendation of the Board of Directors to engage a National Director, Executive Vice President and any and all directors of activities and any changes thereof and to determine major National Council policies; to admit new branches and to discipline and expel branches; and, to nominate and elect officers. In addition, under Not-for-Profit Corporation Law § 602, the Delegate Assembly has the power to adopt, amend or repeal the Constitution. There are no other corporate actions to be taken by the vote of members delineated in either the Constitution or Not-for-Profit Corporation Law.
Thus, as the Constitution contains no requirement for membership consent, the vote of the Delegates Assembly on November 14, 2002, is not a requisite for the sale.
[*8]
However, the vote of the Board of Directors authorizing the sale was necessary. Section 6.2 of the Constitution states that the Board of Directors shall "approve all major functions and fund-raising endeavors to be undertaken by the Organization" and "take any and all action which the Board of Directors deems in the best interest of the Organization."
The National Council's rationale for the sale is that the current Property is an aging structure, whose configuration is ill-suited for the space needs of its headquarters and programs. It wishes to free the National Council from the burden of operating and maintaining an aged structure. It wishes to locate its operation on a single floor, in lieu of the current four floor arrangement. The proceeds [FN7] of the sale would fund an endowment, the income of which would be used to rent a new modern space, already upgraded for 21st century office use. It would also use some of the income to provide financial assistance to YIFA and pay all of YIFA's moving costs. [FN8]
Therefore, the National Council contends that the sale is in the best interest of the corporation and its members. Thus, the Constitution requires the Board of Directors to take action, which is governed by Not-for-Profit Corporation Law § 510 (a) (2). That statute states:

A sale . . . of all, or substantially all, the assets of the corporation may be made upon [*9]such terms and conditions and for such consideration, which may consist in whole or in part of cash . . ., as may be authorized in accordance with the following procedure:
If there are no members entitled to vote thereon, such sale . . . shall be authorized by the vote of at least two-thirds of the entire board, provided that if there are twenty-one or more directors, the vote of a majority of the entire board shall be sufficient.
Based on the foregoing statute, the Petition is fatally flawed as to Board authorization in two respects.
First, the Petition does not annex a schedule setting forth the resolution of the directors granting authority for the sale pursuant to Not-for Profit Corporation Law § 511 (a) (7), since the only resolution annexed to the Petition refers to the Delegates Assembly.
Second, even deeming this reference a technical error, the Petition fails in a more significant respect. It does not show that the sale has been "authorized by vote of the directors in accordance with the law" as required under Not-for-Profit Corporation Law § 510 (a) (2), as the sale was never authorized by a majority of the "entire" Board.
The entire Board of Directors, according to Exhibit K, numbers twenty-four. Section 6.1 of the Constitution provides that the Board of Directors shall consist of all national officers, all past presidents of the National Council, the chairmen of all committees, and the president of the Young Israel Council of Rabbis. A majority of the entire Board, therefore, equals thirteen directors.
Since the Constitution contains no provision that authorizes participation by conference telephone (see Not-for-Profit Corporation Law § 708 [c]), any teleconference votes were not cast in accordance with the law as set forth in Not-for-Profit Corporation Law § 708 (b). Therefore, only the votes of the directors present at the meeting can be counted towards a majority vote. As there were only eleven directors present at the meeting at which the resolution authorizing the sale was considered according to the Board minutes, the sale could not have been properly approved at the meeting under any circumstances. There were insufficient directors present at the meeting to cast the thirteen votes needed to constitute a majority of the entire Board even assuming the facts in the light most favorable to National Council, that all of the directors present cast their votes in favor of the sale. [FN9]
National Council's Petition cites Article 12 of its Constitution, captioned "Miscellaneous Provisions", specifically Constitution § 12.3, which provides "A quorum for a meeting of the Board of Directors shall consist of at least ten members representing five or more branches."
National Council apparently relies on Not-for-Profit Corporation Law §§ 707 and 708 in [*10]citing that provision of its Constitution. Section 707 provides:

Unless a greater proportion is required by this chapter or by the certificate of incorporation or by a by-law adopted by the members, a majority of the entire board shall constitute a quorum for the transaction of business, except that the certificate of incorporation or the by-laws may fix the quorum at less than a majority of the entire board, provided that in the case of a board of fifteen members or less the quorum shall be at least one-third of the entire number of members and in the case of a board of more than fifteen members the quorum shall be at least five members plus one additional member for every ten members (or fraction thereof) in excess of fifteen.
Section 708 (d) states:

Except as otherwise provided in this chapter, the vote of a majority of the directors present at the time of the vote, if a quorum is present at such time, shall be the act of the board. (emphasis added)
Presumably, National Council's argument is that the fifteen directors present (only eleven in person) constituted a quorum. The thirteen affirmative votes constituted a majority of the directors present at the time and therefore carried the vote, according to the National's Council's position.
The court rules that such reliance is unjustified. Not-for-Profit Corporation Law § 510 (a) (2) makes no reference to Not-for-Profit Corporation Law § 708(d) but specifically provides that such a sale must be authorized by "the vote of the majority of the entire board." (Emphasis added.)
Therefore, as it provides "otherwise", Not-for-Profit Corporation § 510 (a) (2) makes a vote of the majority of the full board of directors necessary to authorize the sale. Constitution § 12.3 is consistent with Not-for-Profit Corporation Law § 708 (d), and would apply to other corporate actions taken by the Board.
As the absence of Board authority for the sale is fatal to the Petition, the court does not reach the questions whether the proposed sale is for fair and reasonable consideration and promotes the National Council's corporate purpose or the interest of its members.
It is therefore
ORDERED that the Petition is dismissed.
This is the decision and order of the court.
Dated: September 10, 2003 ENTER:
 
 J.S.C.
Decision Date: September 10, 2003
Footnotes

Footnote 1: YIFA contends that any divestiture of the Property would require its approval, because the court should impose a constructive trust on the Property for its benefit. The court finds no merit to YIFA's argument, as YIFA offers not even slight evidence in this proceeding that it ever had title to the Property, much less transferred such title to the National Council, two of the essential elements of a constructive trust. Simonds v Simonds, 45 NY2d 233 (1978); see also Alexander Presbyterian Church v Presbyterian Church, 64 NY 274 (1876) (Court of Appeals affirmed the dismissal of a similar claim of title to property by a mission church, finding no facts upon which the church could base its claim).

Footnote 2: See Rector, Church Wardens and Vestrymen of St. Bartholomew's Church v Committee to Preserve St. Bartholomew's Church, Inc., 84 AD2d 309 (1st Dept 1982), where the Court held that the Legislature intended the Not-for-Profit Corporation Law to be controlling with respect to religious corporations, with the provisions of the Religious Corporations Law taking precedence only in case of clear and unavoidable conflict between the two statutes. 

Footnote 3: The excluded denominations are the Protestant Episcopal church, the Roman catholic church, the Ruthenian Catholic church of the Greek rite, the African Methodist Episcopal Zion Church, the Presbyterian church, the United Methodist church, and the incorporated Reform church, which each require the consent of a central hierarchical bishop or council for the sale of real property. 

Footnote 4: Under Religious Corporation Law § 2-b (2), since it is not one of the church denominations excluded under paragraph d-1, the National Council is also is a Type B corporation under the Not-for-Profit Corporation Law. A Type B corporation is defined by Not-for-Profit Law § 201 (b) as a not-for-profit corporation formed for a religious non-business purpose.

Footnote 5: While Religious Corporation Law § 12, by its terms, makes Not-for-Profit Law § 511 applicable to a sale of its property by a religious corporation, it does not cite Not-for-Profit Corporation Law § 510. This is of no moment, since Not-for-Profit Law § 511 (a) makes all the provisions of Not-for-Profit Law § 511 applicable to any non-profit "corporation required by law to obtain leave of court to sell all or substantially all of its assets." As Religious Corporation Law § 12 incorporates Not-for-Profit Corporation Law § 511 by reference, it makes any sale by a religious corporation of its real property tantamount to a sale of all or substantially all of such a corporation's assets under Not-for-Profit Corporation Law § 511. As Not-for-Profit Law § 510 applies to a sale of all or substantially all of the assets of the corporation, it also applies to National Council's sale of its Property. In any event, neither party disputes the applicability of Not-for-Profit Corporation Law § 510 to the sale at bar. 

Footnote 6: The delegates are elected or appointed by the constituent branches as follows: two delegates for the first one hundred members of each constituent branch, one delegate for each additional hundred members, a minimum of two delegates for each constituent branch having less than one hundred members, the president of every constituent branch. Constitution § 7.1.

Footnote 7: The Attorney General's approval of the sale of the Property is conditioned upon the deposit by the National Council of four million dollars of the proceeds of the sale into funds or accounts, which may not be expended without further approval of the court, unless to satisfy the National Council's debts or obligations to the New York State Department of Health arising out of its operation of its Shalom Nursing Home.

Footnote 8: Section 3.3 of the National Council Constitution requires all Young Israel branch synagogues to "follow halacha in all dealings by and between the group, its members, its rabbi, its officers and directors, other branches of the Organization and the Organization." Constitution § 3.9 states that "The Young Israel Council of Rabbis should establish a Halacha Committee to determine various halachic issues."
The National Council contends that in accordance with the Constitution, the Halacha Committee convened; the Vaad Halacha or Jewish law Committee unanimously interpreted Jewish law as authorizing the sale but not mandating that the National Council assist YIFA; the Vaad viewed National Council's plans to assist YIFA, as gratuitous under Jewish law.
YIFA disputes that the Vaad determined anything more than a hypothetical question, but contends that the Vaad merely responded to National Council's telephone inquiry. It cites as futher evidence the National Council's refusal to afford YIFA an opportunity to present its position to the Vaad. It proposes that the parties resolve their dispute in a Rabbinic court, known as a Beth Din. YIFA applied to the Beth Din of America to hear and resolve the issue whether the proposed sale of the Property violates Jewish Law. Thus far, the National Council has not submitted its dispute with YIFA to the Beth Din.
The Beth Din is an arbitration process, which requires the consent of the parties. This court can neither compel submission of the National Council to the jurisdiction of the Beth Din, nor decide any question of Jewish law. See Levovitz v Yeshiva Beth Henoch, Inc., 120 AD2d 1906 (2d Dept 1986).

Footnote 9: The minutes of the Board meeting do not set forth the individual votes cast by the Board members. Nor does the Petition set forth the individual votes cast, except for the negative vote cast by the director who is also a YIFA officer. On the record in this proceeding, the court can only deduce that either nine or ten of the directors present voted in favor of the sale. It is impossible on this record to determine whether the abstaining director voted in person or by telephone conference. Nonetheless, since there were insufficient Board members present at the meeting to approve the sale, the lack of a voting record does not affect the court's decision.